United States district Court
District of Connecticut

SCANNED at GCI
and Emailed
1|3|22  by JW  45 pages
date      initials   No.

John C. Barletta          Case No: 3:22·cv·01110·SALM

 - V -

Angel Quiros              Dec. 30   2022


## Plaintiffs Motion In Opposition To Defendants Motion To Dismiss

The Plaintiff Files This Motion In Opposition To
The Defendants Motion To Dismiss and will show
in his memorandum of law reason why this case
Should not be dismissed and allowed to Continue Foward.


12-31-22        John C Barletta
                John C. Barletta


## Certification

I hearby Certify that a copy of This motion was
electronically Filed with The Attorney general office
A.A.G David C. yale

                    John C Barletta    12-31-22

            John C. Barletta  219324
            50 Nunnawauk Rd
            Newtown, Ct.
                    06470

1 of 1

United States District Court
District of Connecticut

John C. Barletta        Case No: 3:22-cv-01110-SALM

  -v-

Angel Quiros                    Dec. 30 2022

## Plaintiffs Memorandum of law In Opposition To Dismiss with Attachments

The Defendant in his motion to dismiss, defence claims
This Case Should be dismissed Based on:
1) Statute of limitations
2) Res Judicata
3) Failuar to state a claim
4) Case was Alredy adjudicated
5) Action involves same parties
6) Plaintiffs Failuar to provide facts Concerning his Condition of Confinement.
7) defence claim defendant lacked personal Knowledge in Plaintiffs long term Segregation status.


1)              Statue of Limitations


The Plaintiff is suing mainly To recover damages
For a abuse That has recently ended.
Mainly his long term illegal segregation From 1999 - To 2021

  See Attached hearing notices From 1999 inital placement, To 2009 reclassification to special needs Segregation to 2021  Totaling 22 years.
  And Hearing notice dated 10/25/22  Second por.

1 of 11

where Dept. of Corr. Clearly State : " Barletta was previously placed on administrative segregation in March 1999 due to incident Barletta murderd his Cellmate. He was removed from A/S status on feb. 10 2010 and placed on special needs segregation until dec. 21. 2021 Totaling 22 years in Combined special needs segregation and administrative segregation.

( Attachments A, B, C, D. )

Statue of limitation  Owens v. OKure 488 U.S 235, 236 (1989)
The defense is relying on The 1999 placement date as The start of The Time limit for The Statue of limitations,

The plaintiff is relying on The end date When The abuse recently ended in 2021 approx 1 year ago. The plaintiff had no idea This Treatment Would go on for over 22 years

With Governors Ned Lamonts recent 2021 executive order No. 21-1 , and Senate Bill No 459 Public act No. 22-18
The use of isolated Confinement and prolonged Isolation. (See attachment E)
The plaintiff Feels This time is ripe to bring This suit  even Though he was Taken off segregation Status in Dec. 12. 2021

Singleton v City of New york 632 F.2d 185 191
(2d cir. 1980) "The crucial time for accrual
purposes is when The plaintiff is aware he is
suffering a wrong in which damages may be recoverd"
 See wilkerson -v- stalder 639 F. supp. 2d 654
(2007); Shoatz -v- wetzel u.s.D.C. (w.D pa) Case
No 2:13-cv-00657-CRE; 2016 us Dist. Lexis 17515.
Defence claim because of a old lawsuit in 2009
Where my long term Segregation was a issue
at That time I was in Segregation 11 years
[Case No 3:10-cv-939-AVC]
My Seg. status of 11 years at That time was one
issue of That case.   Defense claim That was my
time to raise it, and I did.
Citing Sheley -v- Dagger 833 F.2d 1420, 1427
(11th cir. 1987)

Though This is a Simmiluar case That ties back to
That 11 years in Segregation.
 This case is totaly diffrent being now I was
in Segregation over 22 years Just comming
off in Dec. 12 2021
And plaintiffs long term Segregation is The only
issue being Challanged in This Case.

Now it is up to The Court to determine The
Time Frame of Statue of limitation
 On   Did The time start From a Old law suit?

or did The limitatation time start From Dec. 2021 ?

It is For This reason That Statute of limitation should not be a issue, and This case should not be dismissed based on That reason.

The plantiff Contest The time Started on dec. 2021 when The actual Wrong and harm done to him Finally ended.   Thats where he is Filing From.


Arguement II  Defense Claims :

### Res Judicata

The defense Claim of Res Judicata " litigating a Claim more Then once". Citing a old Case Barletta -v- Quiros 3:10-cv-939-Ave, priviously stated Simmiluar issue long term seg of 11 years in That old Case.

Totally diffrent Now being 22 years in seg.

Fact is prior Case Barletta- v- Quiros 3:10-cv-939-Ave Was only dismissed as MooT, Being The plaintiff was Transferd out of State to Oregons Super Max based on Ct. recomendation.

(See Attachment F) Where plaintiff's Case Could Not be Considerd mooT Just because of Transfer, or if Case is likely to reoccur between Same plaintiff and defendant  which it did and has.


Court records Show Barletta v- Quiros 3:10-cv-939 (Ave) Was only dismissed as "Moot" becouse of a Transfer to another state

a Tactic The State of Ct used on The plaintiff in
Two other Cases, where upon The ~~defendant~~ plaintiffs
return to Ct. The Same issues arise, Never being
Settled.    (Attachment F)

In 2018 on plaintiffs return to Ct. He attempted
To re-open The old Case dismissed as moot.
plaintiff was informed by Courts "Could Not reopen
The old Case" [3:10-cv-939 Avc]  But Would have to
Re File a new Case.   (Attachment F)

This Case is not The Same Case Thus The claim
of Res Judicata  Should not apply  For This reason
~~Def~~  This Case Should Not be dismissed.

The defense is bringing up old Cases To Confuse The
issues.

As to Claim 3  defense Claims plaintiff Failed to
State a Claim on relief.

   This is inaccurate, The plaintiff made Clear on his
inital Complaint relife requested.  although The abuse
has ended on dec 12 2021 ,  The defendant Can Not
give back or Make up That time ,  plaintiff is
attempting To be Compensated For his abuse and
defendant held punitivitly responcible.

Defendants Claim  4 and 5
 4) Case was alredy adjudicated , and  5) action
involves The Same parties.

This Case Was not adjudicated   The Plaintiff never
had his day in Court,  Defense refrences a old
Case That was only dissmissed as Moot after a
Transfer To Oregon Not because case had No merit.
(proof in his attachment F)

plaintiff argued;  " Mootness is only established if
1) it can be said with assurance That Their is No
   Reasonable expectation That The alleged violation will
   reoccur,  or 2) if interim relief or events have
   Completely, and irrevocably eradicated The effects
   of alleged violation

quoting   Community School -v- Seattle Sch. Dist. No 1.
          Holland - v- New Jersey Dept of. Corr.


Plaintiff argued upon his return to ct. The Same issue
Would, and did arise again


Boag - v- Macdougall ,  Spencer v- Kemna ,
Hong -v- Doe  and  Bowens v- Quinn

all state The Same :  "Transfer to another prison did
Not Moot prisoner damages arising From placement in
another prison",

And "it They are Capable of repetition yet evading
[Judicial] review   (see Attachment F)


yet The Judge erred in That Case and allowed The
Judical review be evadude , agreed to Call The Case
Moot.

Which it Clearly was not

Being That This issue Still exist & has once again
arisin between The Same plaintiff and defendant
being it was never properly adJudicated

For This reason This Case Should not be dismissed
That, it arises with The Same parties and was
alredy adJudicated.

6) Defense Claims Case Should be dismissed because
    Plaintiff Failed to Provide facts Concerning
    his Condition of Confinement.
The plaintiff has not had the oppotunity to provide the
Facts to The Condition of his ConFinement  being
he has only Filed a initial Complaint, as rules State
Keep his Complaint "Simple and to the point", "Did NoT
Use legal arguement, or set or binding president in his
inital Complaint.

The Conditions of his (The plaintiffs) Confinement is
Clear and will be made clear and is alredy Known.
Being That The plaintiff Was housed at Ct. State
Super Max NorThern for most of that time.

A prison recently shut down deemed Crule and
unusual, and Signifinatly atypical as outlined in
recent Case  Reynolds -v- Arnone

over The years The plaintiff has been housed in
3 diffrent super max prisons That have been shut

down due to Crule & unusual, atypical treatment.
Double walled Cells, Lights on 24 hours a day, No View out
Side windows painted over, No Mirror in cell, 23 hour
lock down, Movement only in Cages in full restriants,
denied activity Physical exercize, Mental and Social emotional
Support, Constent Noise, Cells Flooded with feces, Mentally
Un Stable prisoners who Throw Their own feces.
Plaintiff Was denied mental health Treatment & recived
none. (See attachment G)

The plaintiff was To recive Medical mental health
evaluation prior to his release from Segregation, from
director of psychological Services (see Attachment G)

The plaintiff was Never given any Treatment, Just
Thrown into a open population one day.

The defence Wanting to dismiss This case based on
Failuar To provide facts Concerning Coditions of
Confinement.
The plaintiff has Not had the oppetunity to make any
Claims or Statements of fact being as Stated he
has only Filed The initial Complaint, The defendant
Just answerd That.
The time was/ is not ripe yet to present Those Facts
When Discovery has Not yet been Completed

For This reason This case Should not be dismissed
For Failuar to State Facts on Condition of ~~Enterre~~
Confinement.

7) Defence Claim The defendant lacked personal Knowledge on plaintiffs long term segregation.

This is untrue, being The Fact The defence Constently bring up a old Case from 2009 where I Sued Then Warden Quiros over my time in Segregation Then at That time 11 years.

At That time 2009 Warden quiros was " put on notice", "Given Fair warning", of The Continued abuse and illegal mistreatment of long term illegal segregation.

Simmiluar To <u>ShoaTz -v WeTzel</u> U.S.D.C (W.D PA) Case No 2:13-Cv-00657-CRE; 2016 U.S Dist. Lexis 17515

<u>wilkerson v stalder</u> 639 F. Supp. 2d 654 (2007)

When he was Sued, and internal Complaints were made The issue was brought to his attention in 2009 He had Full Knowledge of Me and The Suit

AS Commissioner Angel Quiros has The duty and responcibility To do High profile inmate reviews ever 6 Months For prisoners on Administrative, or Special needs Segregation -

Meaning Commissioner quiros would have Seen my name, and have to Sign off on my Continued place-ment in Segregation every 6 Months after he stopped being warden and became Commissioner.

Commissioner quiros had to have Know I was

9- of 11

Still in Segregation after 22 years when he was
The one signing off on it.

Unless Commissioner quiros was totally indiffrent to
what he was signing, Just rubber stamping my
Continued Segregation with out reading it, Meaning
I Never got a Fair and Meaningful review or
hearing. Then,

Defendant quiros Signed off on my Continued
Seg placement For years. after he knew I was
alredy in Seg For 11 years as of 2007

To Say defendant quiros was unaware of my time
in Segregation as The Commissioner of Corrections
when he had to authorize it is either
incompetence or Gross neglect and deliberate
indiffrence.

For The Claim defendant quiros had No knowledg of
The plaintiffs long Term Segregation is impossible to
belive.
For This reason This case should not be dismissed on
The Claim The defendant had No knowledge of action.
(see attached H)

For all The Forgoing reasons The plaintiff is in opposition To The defendants request to dismiss

And asks The Court Not to dismiss This case but to allow it to go Foward , and The plaintiff to finally have his day in Court.

Respectfully by pro-se prisoner

12-31 22          John c Borletta
                  John c Barletta


## Certification

I hearby Certify That a copy of The Forgoing was electronicly Filed and Sent To A.A.G. David c Yale at The attorney generals office

12-31-22          John c Barletta
                  John c Barletta


John c. Barletta   214324
50 Nunnawauk Rd
Newtown , Ct.   06470

# ATTACHMENTS, A, B, C, D,

A. Initial 1999 Seg. Placement.

B. Inital Special Needs Placement 2007

C. Classification removal from special needs 2021

D. Second paragraph State admits They held me in Seg
   From March 1999 To Dec. 2021

## Notification of Hearing
### Connecticut Department of Correction

CN
REV 1/3

| Inmate name: Barletta, John | Inmate number: 219324 |
|---|---|

| Facility: Northern CI | | Date: 01/27/10 |

You are being considered for placement to:

☐ Administrative Segregation    ☐ Chronic Discipline
☒ Special Needs Management

A hearing will take place on _____ 02/04/10 _____ at _____ 09:00 AM _____ to determine
                                        date                                 time
whether your presence in general population presents a threat to the safety and security of the institutional
community due to repetitive disciplinary infractions and/or involvement in a serious incident.

### REASON FOR HEARING

You were placed on Administrative Segregation status on March 23, 1999 due to poor overall behavior
which includes the murder of your cellmate. Northern CI has recently reviewed your disciplinary
behavior to include your out of state behavior, classification statuses, and the nature of your placement
on Administrative Segregation. As a result, Warden Quiros has determined that you may be removed
from Administrative Segregation status and can be managed on Special Needs Management
classification status. Based on the severity of your prior disruptive and assaultive behavior, which
includes 6 Assault on DOC Employee disciplinary reports, you continue to be considered a threat to the
safety of staff, the facility and/or the public. Therefore, a classification hearing will be held on the above
date and time to review you for placement on Special Needs Management status.

Therefore, a classification hearing will be held to review you for placement on Administrative Segregation, Chronic Discipline
Special Needs Management status. If you desire a staff advocate to act on your behalf, you are to indicate this below, in rankin
order, the advocate of your choice. A reasonable number of relevant and non-redundant witnesses' statements may be requeste
on your behalf. This hearing will determine possible placement into Administrative Segregation, Chronic Discipline or Speci
Needs Management. If placed into Administrative Segregation, Chronic Discipline or Special Needs Management, you will b
managed in accordance with Administrative Directive 9.4, Restrictive Status.

| Advocate Choice(s): | Witness(es) Requested: |
|---|---|
| 1. CC Tourangeau | 1. _____ |
| 2. CC Szaban | 2. _____ |
| 3. CTO Thompson | 3. _____ |
| ☐ Advocate Declined | ☐ Witness(es) Declined |

| Delivered by CTO Mu'min | on 8:02 am | at 2/2/10 |
|---|---|---|
| Staff name and title - print | date | time |

| Inmate signature: Jm C Barletta | Date: 2-2-2010 |
|---|---|
| Staff signature: | Date: 2/2/10 |

Staff witness shall indicate if inmate refuses to sign

distribution:    Director of Offender Classification and Population Management, Inmate master file, Inmate



# University of Connecticut Health Center

## CORRECTIONAL MANAGED HEALTH CARE

### Special Needs Facility Management Plan

June 29, 2009

**Inmate: Barletta, John**
**Inmate number: 219324**
**DOB: 11/30/1970**

John Barletta is a 39 year-old Caucasian male currently held at Northern Correctional Institution in Somers, CT. Mr. Barletta is serving a life sentence for Capitol Felony Murder. He is also designated a High Security inmate due to his violence history and Security Risk Group (SRG) designation: Aryan Brotherhood. Mr. Barletta has amassed 45 Disciplinary Reviews since his DOC admission, including Assault on both inmates and staff; Threats; and SRG affiliation. Mr. Barletta was sent to the Maryland DOC in 2001, only to return after violence between himself and other inmates. Upon return, Northern administration recommended Mr. Barletta be placed immediately in the Special Needs program because of is historically poor adjustment to general population facilities here in Connecticut. Mr. Barletta had also assaulted the Warden in Northern CI by using a razor to slash his throat. Upon interview, it remains abundantly clear that Mr. Barletta lacks any investment in reducing his propensity for future violence. His ideologies remain strong and just as rigid. Any perceived threat, by inmate or staff, will undoubtedly be resolved through violence. In addition, Mr. Barletta experiences no remorse with this level of conduct, and in fact may thrive under these conditions. Because inmate Barletta poses a continuous risk of violence for both inmates and staff, CDOC administrators have recommended Mr. Barletta transition to Special Needs housing here at Northern CI.

Special Needs housing will afford Mr. Barletta additional privileges closely resembling that of a general population inmate, just in a highly structured and supervised correctional environment. This includes:

1) Two recreation periods per day (both first and second shift)
2) Twice a week, he may use the facility gymnasium (3 West SN inmates only)
3) Showers M-F each week
4) TV and walkman radio allowed
5) A custody single cell is also recommended

Mr. Barletta is classified as a Mental Health 2 inmate, he must write to mental health staff for a talking therapy session. Additionally, Mental Health staff tour the facility 3 times a week where Mr. Barletta can check in if needed. He can also reach out to custody staff during their tours. This Special Needs plan will be reviewed every 6 months, with the goal of potentially transferring him to a general population facility.

Mark Frayne, PsyD
Supervising Psychologist 2

Suzanne Ducate, MD

| | Records Notification form for Risk Reduction Earned Credit<br>Non - Compliance/Compliance Notification<br>Connecticut Department of Correction | | CN42A01<br>Revised<br>02/01/16 |
|---|---|---|---|
| Inmate Name: Barletta, John | Number: 219324 | Facility: Walker | Date:<br>12/20/2021 |

## Non-Compliance Section

### Section 1: Refusals

| | | | Records Staff Only |
|---|---|---|---|
| Check Box | Type of Non-compliance | Date of Non-Comply | Flag Status |
| | Refused to Provide DNA sample | | N |
| | Refused to Comply with Sex Offender Registration | | N |
| | Refused to sign OAP form (CN9701) or (CN9702) | | N |
| | Other | | TBD |

### Section 2: Restrictive Status changes

| | | | Records Staff Only |
|---|---|---|---|
| Check Box | Type of Classification change | Date of Non-Comply | Flag Status |
| | Inmate was readmitted to DOC custody maintaining SRGM or SN status | | Update Restrictive Housing Status (RTSG Screen) |
| | Inmate was recently sentenced maintaining SRGM, CD, AS, SN status | | |
| | Inmate was recently reclassified as CD, AS, SN or SRGM. | | |

### Section 3: Remanded from Parole

| | | | Records Staff Only |
|---|---|---|---|
| Check Box | | Date of Non-Comply | Flag Status |
| | BOPP Revoked Parole (Attached disposition form) [Forfeited Days_____] | | |
| | Other: | | |

## Compliance Section

### Section 4: Compliant in accordance with Administrative Directive 4.2a

| | | | Records Staff Only |
|---|---|---|---|
| Check Box | Type of Compliance | Date of Comply | Flag Status |
| XXXXX | Inmate was reclassified/removed from SRGM, CD, AS, or **Special Needs** | 12/20/2021 | Update Restrictive Housing Status (RTSG Screen) |
| | Provided DNA sample | | Y |
| | Sex Offender Registration completed | | Y |
| | Signed Offender Accountability Plan (CN9701 or CN9702) | | Y |
| | OTHER: | | |

| Staff Name (Print):<br>Elizabeth Tugie | Staff Signature: *Elizabeth Tugie* | Date:<br>12/20/2021 |
|---|---|---|
| Inmate Signature: | | Date: |
| Records Specialist Name (Print): | Records Specialist Signature: | Date: |
| Unit Administrator Name (Print): | Unit Administrator Signature **(only required for those removed without malice):** | Date: |

Original in section 6 of master file, copy provided to Inmate.



# Notification of Hearing
## Connecticut Department of Correction

CN 9402
REV 09/20/17

| Inmate name: Barletta, John | Inmate number: 219324 |
|---|---|
| Facility: Garner CI | Date: 10/28/22 |

### You are being considered for placement to:

| ☒ Administrative Segregation | ☐ Special Needs Management | ☐ Chronic Discipline |
|---|---|---|

| A hearing will take place on | 11/07/2022 | at | 8:30 a.m. (via video conference) |
|---|---|---|---|
| | date | | time |

The purpose of this hearing is to determine whether your presence in general population presents a threat to the safety and security of the institutional community due to repetitive disciplinary infractions and/or involvement in a serious incident.

### REASON FOR HEARING

On October 19, 2022, at approximately 12:49 p.m., during unit recreation, while housed in P Unit at MacDougall Correctional Institution (MCI), Inmate Barletta, John #219324 physically assaulted another Inmate. Upon observing this altercation, the Unit Officer called via the radio for staff needing assistance. At this time, it was also quickly discovered that Inmate Barletta was utilizing a handmade weapon during the assault. In order to gain compliance and cease Barletta's actions; chemical agent was deployed to his facial region and he was given verbal commands. Inmate Barletta immediately complied with responding staffs' direction(s); placed the weapon on a nearby table, was secured in wrist restraints, and escorted out of the unit without further incident. The other inmate involved in the incident was taken to an outside hospital as a result of the injuries he received. Due to the nature of the incident, the Connecticut State Police (CSP) were contatcted and reported to the facility.

As a result of his actions, Inmate Barletta #219324 was issued 2 – Class A Level Disciplinary Reports (DRs); one for Contraband A and the other for Felonious Misconduct to which he plead guilty. While being incarcerated in Connecticut, Barletta has acquired a total of 58 DRs, most of which were severe Class A Level DRs (13 Contraband A, 3 Felonious Misconduct, 8 Assault on DOC Employee, 3 Assault, 3 Fighting, 1 Arson). Barletta was previously placed on Administrative Segregation (AS) status in March 1999 due to an incident in which Barletta admittedly murdered his cellmate. He was removed from AS status on February 10, 2010 and was subsequently placed on Special Needs status until December 12, 2021. Inmate Barletta #219324 is currently serving a Life/Indeterminate Sentence without the possibility of Parole for Capitol Felony Murder.

In order to maintain the normal operations of the facility and ensure the safety of the inmate population and staff, Warden Dougherty has requested that Inmate Barletta, John #219324 be reviewed for a higher level of security

Therefore, a classification hearing will be held to review you for placement on Administrative Segregation, Chronic Discipline or Special Needs Management status. If you desire a staff advisor to act on your behalf, you are to indicate this below, in ranking order, the advisor of your choice. A reasonable number of relevant and non-redundant witnesses' statements may be requested on your behalf. This hearing will determine possible placement into Administrative Segregation, Chronic Discipline or Special Needs Management. If placed into Administrative Segregation, Chronic Discipline or Special Needs Management, you will be managed in accordance with Administrative Directive 9.4, Restrictive Status and may not earn Risk reduction Earned Credit in accordance with Administrative Directive 4.2A.

| Advisor Choice(s): | | Witness(es) Requested: | |
|---|---|---|---|
| 1. | | 1. | |
| 2. | | 2. | |
| 3. | | 3. | |

| ☒ Advisor Declined | | ☒ Witness(es) Declined | |
|---|---|---|---|
| Delivered by | MACKLIN  CTO | on | 10/31/22 | at | 10:30 am |
| | Staff name and title - print | | date | | time |
| Inmate signature: | Jon C Barto | | Date: 10:30 AM |
| Staff signature: | | | Date: 10:30 AM |

- Staff witness shall indicate if inmate refuses to sign
- Distribution: Director of Offender Classification and Population Management, inmate master file, inmate

# Attachment E

Executive order

Senete bill act.

**STATE OF CONNECTICUT**

**BY HIS EXCELLENCY**

**NED LAMONT**

**EXECUTIVE ORDER NO. 21-1**

**WHEREAS,** the Constitution of the State of Connecticut and the Constitution of the United States dictate that the State should deliver a standard of treatment of incarcerated people consistent with evolving community standards; and

**WHEREAS,** the United Nations' Nelson Mandela Rules provide that isolated confinement of 22 hours or more per day may not be used for a period exceeding fifteen days, and that isolated confinement may be used only in exceptional cases and only as a last resort; and

**WHEREAS,** states around the country have acted through legislation or administrative policy to reduce the use of isolated confinement and eliminate prolonged isolate confinement;

**WHEREAS,** national and international nongovernmental organizations recommend alternatives to use of isolated confinement as a population management tool; and

**WHEREAS,** the State of Connecticut has taken substantial steps to reduce the use of isolated confinement by, among other steps, closing Northern Correctional Institution; and

**WHEREAS,** the Department of Correction administers all jails and prisons in the state; and

**WHEREAS,** reducing the use of isolated confinement and eliminating prolonged isolated confinement can produce better outcomes for incarcerated people and the staff responsible for their supervision; and

**WHEREAS,** increased opportunities for contact visits will keep incarcerated people connected to their families and communities, and reduce recidivism rates by helping people to flourish after reentering the community; and

**WHEREAS,** reducing the use of in-cell restraints will ensure the highest respect for the human dignity of incarcerated people;

**NOW, THEREFORE, I, NED LAMONT,** Governor of the State of Connecticut, by virtue of the authority vested in me by the Constitution and the laws of the State of Connecticut, do hereby **ORDER AND DIRECT**:

1.  As used in this Order:

    a. "Disciplinary status" means a status in which restrictions are imposed on an incarcerated person due to such person's behavior, either pending or following a disciplinary hearing;

    b. "Extraordinary circumstances" means a serious incident resulting in a lockdown of a substantial portion of a correctional facility;

    c. "General population" means any status other than a restrictive status program;

    d. "Isolated confinement" means confinement of an incarcerated person in a cell, alone or with others, for twenty or more hours per day;

    e. "Prolonged isolated confinement" means isolated confinement for more than fifteen consecutive days or more than thirty days in any sixty-day period; and

    f. "Restrictive status program" means a Department of Correction program other than disciplinary status with restrictive rules involving multiple phases with progressively increased privileges, including, but not limited to, administrative segregation, chronic discipline, and security risk group.

2. By September 1, 2021, the Department of Correction shall guarantee that, outside of extraordinary circumstances, incarcerated persons in the general population shall be held in isolated confinement only due to disciplinary status.

3. By October 1, 2021, the Department of Correction shall guarantee that, outside of extraordinary circumstances:

    a. Any incarcerated person in isolated confinement shall have a meaningful opportunity to be out of such person's cell for two hours each day; and

    b. No person shall be held in prolonged isolated confinement due to disciplinary status.

4. By December 1, 2021, the Department of Correction shall guarantee that, outside of extraordinary circumstances:

    a. Incarcerated persons, including those in restrictive status programs, shall be held in isolated confinement only due to disciplinary status;

    b. No person shall be held in prolonged isolated confinement.

5. By October 1, 2021, the Department of Correction shall make policy changes to limit the use of isolated confinement on members of vulnerable populations to the greatest extent possible. For the purposes of this paragraph, "member of a vulnerable population" means a person who:

    a. Is under eighteen years of age, or sixty-five years of age or older;

    b. Has a mental health needs score of four or five;

    c. Has a developmental disability, as defined in section 17b-28;

    d. Has a serious medical condition that cannot be effectively treated in isolated confinement;

    e. Is pregnant, is in the postpartum period, or has recently suffered a miscarriage or terminated a pregnancy; or

    f. Has a significant auditory or visual impairment.

    a.   "Disciplinary status" means a status in which restrictions are imposed on an incarcerated person due to such person's behavior, either pending or following a disciplinary hearing;

    b.   "Extraordinary circumstances" means a serious incident resulting in a lockdown of a substantial portion of a correctional facility;

    c.   "General population" means any status other than a restrictive status program;

    d.   "Isolated confinement" means confinement of an incarcerated person in a cell, alone or with others, for twenty or more hours per day;

    e.   "Prolonged isolated confinement" means isolated confinement for more than fifteen consecutive days or more than thirty days in any sixty-day period; and

    f.   "Restrictive status program" means a Department of Correction program other than disciplinary status with restrictive rules involving multiple phases with progressively increased privileges, including, but not limited to, administrative segregation, chronic discipline, and security risk group.

2.  By September 1, 2021, the Department of Correction shall guarantee that, outside of extraordinary circumstances, incarcerated persons in the general population shall be held in isolated confinement only due to disciplinary status.

3.  By October 1, 2021, the Department of Correction shall guarantee that, outside of extraordinary circumstances:

    a.   Any incarcerated person in isolated confinement shall have a meaningful opportunity to be out of such person's cell for two hours each day; and

    b.   No person shall be held in prolonged isolated confinement due to disciplinary status.

4.  By December 1, 2021, the Department of Correction shall guarantee that, outside of extraordinary circumstances:

    a.   Incarcerated persons, including those in restrictive status programs, shall be held in isolated confinement only due to disciplinary status;

    b.   No person shall be held in prolonged isolated confinement.

5.  By October 1, 2021, the Department of Correction shall make policy changes to limit the use of isolated confinement on members of vulnerable populations to the greatest extent possible. For the purposes of this paragraph, "member of a vulnerable population" means a person who:

    a.   Is under eighteen years of age, or sixty-five years of age or older;

    b.   Has a mental health needs score of four or five;

    c.   Has a developmental disability, as defined in section 17b-28;

    d.   Has a serious medical condition that cannot be effectively treated in isolated confinement;

    e.   Is pregnant, is in the postpartum period, or has recently suffered a miscarriage or terminated a pregnancy; or

    f.   Has a significant auditory or visual impairment.



**Substitute Senate Bill No. 459**

## Public Act No. 22-18

**AN ACT CONCERNING THE CORRECTION ADVISORY COMMITTEE, THE USE OF ISOLATED CONFINEMENT AND TRANSPARENCY FOR CONDITIONS OF INCARCERATION.**

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 18-81jj of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

[(a) For the purposes of this section, "ombudsman services" includes (1) the receipt of complaints by the ombudsman from persons eighteen years of age or younger in the custody of the Commissioner of Correction regarding decisions, actions, omissions, policies, procedures, rules or regulations of the Department of Correction, (2) investigating such complaints, rendering a decision on the merits of each complaint and communicating the decision to the complainant, (3) recommending to the commissioner a resolution of any complaint found to have merit, (4) recommending policy revisions to the department, and (5) publishing a quarterly report of all ombudsman services activities.

(b) The Commissioner of Correction shall hire a person to provide ombudsman services and shall annually report the name of such person to the joint standing committee of the General Assembly having cognizance of matters relating to the Department of Correction in

*Substitute Senate Bill No. 459*

accordance with the provisions of section 11-4a. In addition to the executive assistant positions authorized under subdivision (10) of section 5-198, the commissioner may hire an executive assistant to carry out the duties of this section.

(c) Prior to any person eighteen years of age or younger in the custody of the Commissioner of Correction obtaining ombudsman services, such person shall have reasonably pursued a resolution of the complaint through any existing internal grievance of appellate procedures of the Department of Correction.

(d) All oral and written communications, and records relating to such communications between a person eighteen years of age or younger in the custody of the Commissioner of Correction and the ombudsman or a member of the ombudsman's staff, including, but not limited to, the identity of a complainant, the details of a complaint and the investigative findings and conclusions of the ombudsman shall be confidential and shall not be disclosed without the consent of the person, except that the ombudsman may disclose without the consent of the person (1) such communications or records as may be necessary for the ombudsman to conduct an investigation and support any recommendations the ombudsman may make, or (2) the formal disposition of a person's complaint when requested in writing by a court that is hearing such person's application for a writ of habeas corpus that was filed subsequent to an adverse finding by the ombudsman on such person's complaint.

(e) Notwithstanding the provisions of subsection (d) of this section, whenever in the course of providing ombudsman services, the ombudsman or a member of the ombudsman's staff becomes aware of the commission or planned commission of a criminal act or a threat to the health and safety of any person or the security of a correctional facility, the ombudsman shall notify the Commissioner of Correction or a facility administrator of such act or threat and the nature and target of

*Substitute Senate Bill No. 459*

the act or threat.

(f) If the Commissioner of Correction has a reasonable belief that a person eighteen years of age or younger in the custody of the commissioner has made or provided to the ombudsman an oral or written communication concerning a safety or security threat within the Department of Correction or directed against an employee of the department, the ombudsman shall provide to the commissioner all oral or written communications relevant to such threat.]

(a) There is established the Correction Advisory Committee that shall consist of nine members. Such members shall be appointed as follows:

(1) One who is directly impacted, appointed by the Senate chairperson of the joint standing committee of the General Assembly having cognizance of matters relating to the Department of Correction;

(2) One who has expertise in law, specifically the rights of incarcerated persons, appointed by the House chairperson of the joint standing committee of the General Assembly having cognizance of matters relating to the Department of Correction;

(3) One who has a demonstrated interest in advancing the rights and welfare of incarcerated persons, appointed by the president pro tempore of the Senate;

(4) One who has a demonstrated interest in advancing the rights and welfare of incarcerated persons, appointed by the speaker of the House of Representatives;

(5) One who has expertise in the provision of mental health care to incarcerated persons or formerly incarcerated persons, appointed by the minority leader of the Senate;

(6) One who has expertise in the provision of medical care to

**Public Act No. 22-18**                                                    *3 of 23*

*Substitute Senate Bill No. 459*

incarcerated persons or formerly incarcerated persons, appointed by the minority leader of the House of Representatives; and

(7) Three who are appointed by the Governor, one of whom has expertise in corrections, one of whom has expertise in medication in a correctional setting and one of whom is directly impacted.

(b) For purposes of subsection (a) of this section, "directly impacted" means (1) a person who was previously incarcerated within a facility operated by the department and is no longer under probation or any supervision by the department, or (2) a family member of a person described in subdivision (1) of this subsection or of a person who is in the custody of the Commissioner of Correction.

(c) All appointments to the committee, including vacancy appointments which shall be filled by the appointing authority having the power to make the original appointment, shall be made as follows:

(1) Not later than thirty days after the effective date of this section or after any vacancy, each appointing authority or any such authority filling a vacancy shall submit a letter designating such authority's appointment or appointments to the joint standing committee of the General Assembly having cognizance of matters relating to the Department of Correction. Such joint standing committee shall post such letters on its Internet web site. The Senate and House chairpersons of such joint standing committee shall schedule a public hearing of such proposed appointments to be conducted not later than forty days after the effective date of this section, or ten days after the submission of a letter in the case of a vacancy.

(2) After such hearing, each appointing authority shall confirm or withdraw such authority's appointment or appointments. Any appointing authority who withdraws an appointment shall, not later than ten days after such withdrawal, submit a new letter to such joint

*Substitute Senate Bill No. 459*

standing committee of the General Assembly designating a different appointment or appointments, which shall initiate the hearing and approval or withdrawal process pursuant to subdivision (1) of this subsection and this subdivision for such appointment or appointments.

(d) The chairpersons of the Correction Advisory Committee shall be the members appointed pursuant to subdivisions (1) and (2) of subsection (a) of this section. Such chairpersons shall schedule the first meeting of said committee, which shall be held not later than sixty days after the effective date of this section.

(e) Each committee member shall serve a four-year term, except that each initial term shall run for four years from February 1, 2023. Each committee member may serve up to two terms. In the event of a vacancy appointment, the member appointed to fill the vacancy shall serve the remainder of the original member's four-year term and may be reappointed for up to two more terms.

(f) Each member shall serve without compensation but shall, within available appropriations, be reimbursed for necessary expenses that such member may incur through service on the Correction Advisory Committee.

(g) Each member shall, not later than ten days after the first meeting of the Correction Advisory Committee in which such member participates, take an oath of office to diligently and honestly administer the affairs of said committee. The oath shall be administered by a chairperson of said committee.

(h) A majority of the members appointed to the Correction Advisory Committee shall constitute a quorum, which shall be necessary for the committee to conduct business. A majority vote of the members present shall be required for action of the committee.

(i) Any committee member shall be indemnified and represented by

*Substitute Senate Bill No. 459*

the Attorney General pursuant to section 5-141d.

(j) The Correction Advisory Committee shall perform the following functions:

(1) Submit a list of candidates for Correction Ombuds for the Governor's consideration, pursuant to subsection (k) of this section;

(2) Review the actions of the Correction Ombuds pursuant to section 2 of this act;

(3) Meet not less than quarterly to bring matters to the Correction Ombuds' attention and to consult on the Correction Ombuds' services, findings and recommendations; and

(4) Convene semiannual public hearings to discuss the Correction Ombuds' services, findings and recommendations.

(k) Not later than eighty days after the effective date of this section or not later than sixty days after any vacancy in the position of Correction Ombuds, the Correction Advisory Committee shall solicit applications for such position and meet to consider and interview the most qualified candidates who are residents of this state for such position. Said committee shall select not fewer than three and not more than five of the most outstanding candidates, publish the names of such selected candidates on said committee's Internet web site and hold a public hearing allowing testimony from members of the public concerning the selected candidates. Said committee shall submit to the Governor a list of selected candidates. Such list shall rank the candidates in the order of committee preference.

(l) Not later than thirty days after receiving the list submitted under subsection (k) of this section, the Governor, with the approval of the General Assembly, shall appoint a person qualified by training and experience as the Correction Ombuds. If at any time any of the

*Substitute Senate Bill No. 459*

candidates withdraw from consideration prior to confirmation by the General Assembly, the designation shall be made from the remaining candidates on the list submitted to the Governor. If, not later than thirty days after receiving the list, the Governor fails to designate a candidate from the list, the candidate ranked first shall receive the designation and be referred to the General Assembly for confirmation. If the General Assembly is not in session, the designated candidate shall serve as acting Correction Ombuds and be entitled to the compensation, privileges and powers of the Correction Ombuds until the General Assembly meets to take action on said appointment.

(m) The person appointed as Correction Ombuds shall serve for an initial term of two years and may serve until a successor is appointed and confirmed in accordance with this section. Such person may be reappointed for succeeding terms.

(n) Upon any vacancy in the position of Correction Ombuds and until such time as a candidate has been confirmed by the General Assembly or, if the General Assembly is not in session, has been designated by the Governor, the Associate Correction Ombuds, as designated by the Correction Advisory Committee, shall serve as the acting Correction Ombuds and be entitled to the compensation, privileges and powers of the Correction Ombuds until the General Assembly meets to take action on said appointment.

Sec. 2. (NEW) (*Effective July 1, 2022*) (a) (1) There is, within the Office of Governmental Accountability established under section 1-300 of the general statutes, as amended by this act, the Office of the Correction Ombuds for the provision of ombuds services. The Correction Ombuds appointed pursuant to section 18-81jj of the general statutes, as amended by this act, shall be the head of said office.

(2) For purposes of this section, "ombuds services" includes:

*Substitute Senate Bill No. 459*

(A) Evaluating the delivery of services to incarcerated persons by the Department of Correction;

(B) Reviewing periodically the nonemergency procedures established by the department to carry out the provisions of title 18 of the general statutes and evaluating whether such procedures conflict with the rights of incarcerated persons;

(C) Receiving communications from persons in the custody of the Commissioner of Correction regarding decisions, actions, omissions, policies, procedures, rules or regulations of the department;

(D) Conducting site visits of correctional facilities administered by the department;

(E) Reviewing the operation of correctional facilities and nonemergency procedures employed at such facilities. Nonemergency procedures include, but are not limited to, the department's use of force procedures;

(F) Recommending procedure and policy revisions to the department;

(G) Taking all possible actions, including, but not limited to, conducting programs of public education, undertaking legislative advocacy and making proposals for systemic reform and formal legal action in order to secure and ensure the rights of persons in the custody of the commissioner. The Correction Ombuds shall exhaust all other means to reach a resolution before initiating litigation; and

(H) Publishing on an Internet web site operated by the Office of the Correction Ombuds a semiannual summary of all ombuds services and activities during the six-month period before such publication.

(b) Notwithstanding any provision of the general statutes, the

*Substitute Senate Bill No. 459*

Correction Ombuds shall act independently of any department in the performance of the office's duties.

(c) The Correction Ombuds may, within available funds, appoint such staff as may be deemed necessary. The duties of the staff may include the duties and powers of the Correction Ombuds if performed under the direction of the Correction Ombuds.

(d) The General Assembly shall annually appropriate such sums as necessary for the payment of the salaries of the staff and for the payment of office expenses and other actual expenses incurred by the Correction Ombuds in the performance of the Correction Ombuds' duties. Any legal or court fees obtained by the state in actions brought by the Correction Ombuds shall be deposited in the General Fund.

(e) In the course of investigations, the Correction Ombuds shall rely on a variety of sources to corroborate matters raised by incarcerated persons or others. Where such matters turn on validation of particular incidents, the Correction Ombuds shall endeavor to rely on communications from incarcerated persons who have reasonably pursued a resolution of the complaint through any existing internal grievance procedures of the Department of Correction. In all events, the Correction Ombuds shall make good faith efforts to provide an opportunity to the Commissioner of Correction to investigate and to respond to such concerns prior to making such matters public.

(f) All oral and written communications, and records relating to such communications between a person in the custody of the Commissioner of Correction and the Correction Ombuds or a member of the Office of the Correction Ombuds staff, including, but not limited to, the identity of a complainant, the details of the communications and the Correction Ombuds' findings shall be confidential and shall not be disclosed without the consent of such person, except that the Correction Ombuds may disclose without the consent of such person general findings or

*Substitute Senate Bill No. 459*

policy recommendations based on such communications, provided no individually identifiable information is disclosed. The Correction Ombuds shall disclose sufficient information to the Commissioner of Correction or the commissioner's designee as is necessary to respond to the Correction Ombuds' inquiries or to carry out recommendations, but such information may not be further disclosed outside of the Department of Correction.

(g) Notwithstanding the provisions of subsection (f) of this section, whenever in the course of carrying out the Correction Ombuds' duties, the Correction Ombuds or a member of the Office of the Correction Ombuds staff becomes aware of the commission or planned commission of a criminal act or threat that the Correction Ombuds reasonably believes is likely to result in death or substantial bodily harm, the Correction Ombuds shall notify the Commissioner of Correction or an administrator of any correctional facility housing the perpetrator or potential perpetrator of such act or threat and the nature and target of the act or threat.

(h) Notwithstanding any provision of the general statutes concerning the confidentiality of records and information, the Correction Ombuds shall have access to, including the right to inspect and copy, any records necessary to carry out the responsibilities of the Correction Ombuds, as provided in this section. The provisions of this subsection shall not be construed to compel access to any record protected by the attorney-client privilege or attorney-work product doctrine or any record related to a pending internal investigation, external criminal investigation or emergency procedures. For purposes of this subsection, "emergency procedures" are procedures the Department of Correction uses to manage control of tools, keys and armories and concerning department emergency plans, emergency response units, facility security levels and standards and radio communications.

(i) In the performance of the responsibilities provided for in this

section, the Correction Ombuds may communicate privately with any person in the custody of the commissioner. Such communications shall be confidential except as provided in subsections (e) and (f) of this section.

(j) The Correction Ombuds may apply for and accept grants, gifts and bequests of funds from other states, federal and interstate agencies, for the purpose of carrying out the Correction Ombuds' responsibilities. There is established within the General Fund a Correction Ombuds account which shall be a separate nonlapsing account. Any funds received under this subsection shall, upon deposit in the General Fund, be credited to said account and may be used by the Correction Ombuds in the performance of the Correction Ombuds' duties.

(k) The name, address and other personally identifiable information of a person who makes a complaint to the Correction Ombuds, information obtained or generated by the Office of the Correction Ombuds in the course of an investigation and all confidential records obtained by the Correction Ombuds or the office shall be confidential and shall not be subject to disclosure under the Freedom of Information Act, as defined in section 1-200 of the general statutes, or otherwise except as provided in subsections (f) and (g) of this section.

(l) No state or municipal agency shall discharge, or in any manner discriminate or retaliate against, any employee who in good faith makes a complaint to the Correction Ombuds or cooperates with the Office of the Correction Ombuds in an investigation.

(m) Not later than December 1, 2023, and annually thereafter, the Correction Ombuds shall submit a report, in accordance with section 11-4a of the general statutes, to the joint standing committee of the General Assembly having cognizance of matters relating to the Department of Correction regarding the conditions of confinement in the state's correctional facilities and halfway houses. Such report shall detail the

*Substitute Senate Bill No. 459*

Correction Ombuds' findings and recommendations.

Sec. 3. Section 18-96b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2022*):

(a) As used in this section:

(1) "Administrative segregation status" means the Department of Correction's practice of placing an [inmate] incarcerated person on restrictive housing status following a determination that such [inmate] incarcerated person can no longer be safely managed within the general [inmate] population of the correctional facility; [and]

(2) "Commissioner" means the Commissioner of Correction;

(3) "De-escalation" means attempting to defuse a crisis without the use of force;

(4) "Department" means the Department of Correction;

(5) "Grievance" means a formal complaint filed by any incarcerated person with the internal grievance system or the department;

(6) "Incarcerated person" means a person confined and in the custody and care of the commissioner, including persons in pretrial, presentencing or post-conviction confinement;

(7) "Isolated confinement" means any form of confinement of an incarcerated person within a cell, except during a facility-wide emergency, lockdown or for the purpose of providing medical or mental health treatment, with less than the following time out of cell:

(A) For all incarcerated persons, four hours per day, on and after July 1, 2022;

(B) For all incarcerated persons in the general population, four and a

**Public Act No. 22-18**                                    **12** *of 23*

*Substitute Senate Bill No. 459*

half hours per day, on and after October 1, 2022; and

(C) For all incarcerated persons in general population, five hours per day, on and after April 1, 2023;

(8) "Lockdown" means the enforced detainment of all incarcerated persons within such persons' cells imposed upon an entire correctional facility or part of such facility, other than for the purpose of administrative meetings;

(9) "Medical professional" means (A) a physician licensed under chapter 370; (B) a physician assistant licensed under chapter 370; or (C) an advanced practice registered nurse, registered nurse or practical nurse licensed under chapter 378;

[(2)] (10) "Restrictive housing status" means [the designation] any classification of an [inmate] incarcerated person by the Department of Correction that [provides for] requires closely regulated management and separation of such [inmate from other inmates.] incarcerated person from other incarcerated persons, including, but not limited to, administrative segregation status, punitive segregation status, transfer detention status, administrative detention status, security risk group status, chronic discipline status, special needs status and protective custody status;

(11) "Therapist" means any (A) physician licensed pursuant to chapter 370 who specializes in psychiatry; (B) psychologist licensed pursuant to chapter 383; (C) an advanced practice registered nurse licensed pursuant to chapter 387; (D) clinical social worker or master social worker licensed pursuant to chapter 383b; or (E) professional counselor licensed pursuant to chapter 383c; and

(12) "Use of force" means the use of physical force or deadly physical force, as defined in section 53a-3, by a department employee to compel compliance by an incarcerated person. Use of force includes, but is not

*Substitute Senate Bill No. 459*

limited to, the use of restraints, chemical agents, canines or munitions or forcible extraction from a cell, other than in response to a psychiatric emergency.

[(b) The Department of Correction shall publish on its Internet web site the formula for calculating an inmate's mental health score and a description of any form and phase of housing employed at any of its correctional facilities for inmates on restrictive housing status.]

(b) The department shall not hold any person under eighteen years of age in isolated confinement.

(c) Any use of isolated confinement shall maintain the least restrictive environment necessary for the safety of incarcerated persons and staff, and the security of the facility.

(d) If holding an incarcerated person in isolated confinement, the department shall:

(1) Not later than twenty-four hours after initiating the process of holding such person in isolated confinement, ensure that a medical professional conducts a physical examination and a therapist conducts a mental health evaluation of such person;

(2) Ensure regular monitoring to ensure such person's safety and well-being, including a daily check-in from a therapist;

(3) Continue de-escalation efforts when applicable and appropriate to the situation; and

(4) Provide to such person access to the following:

(A) Reading materials, paper, and a writing implement;

(B) Not less than three showers per week; and

*Substitute Senate Bill No. 459*

(C) Not less than two hours out of cell per day, including at least one hour for recreational purposes.

(e) Placement of an incarcerated person in isolated confinement shall be subject to the following:

(1) The department may place a person in isolated confinement only after consideration of less restrictive measures;

(2) No person may be placed in isolated confinement for longer than necessary and no more than fifteen consecutive days or thirty total days within any sixty-day period, after which period, such person shall be released from isolated confinement; and

(3) No person may be placed in isolated confinement based on the same incident that was previously used as the basis for such placement.

(f) No person may be held in isolated confinement for protective custody, except that isolated confinement may be used while the department is determining whether protective custody status is appropriate. The department shall limit the time period for such determination to not more than five business days.

(g) The department shall not impose a lockdown upon an entire correctional facility or part of a correctional facility for purposes of training department staff for more than twenty-four cumulative hours during any thirty-day period.

(h) Not later than January 1, 2024, the department shall report, in accordance with the provisions of section 11-4a, to the joint standing committee of the General Assembly having cognizance of matters relating to the Department of Correction and the Criminal Justice Policy and Planning Division established under section 4-68m concerning measures taken by the department to address the following:

*Substitute Senate Bill No. 459*

(1) The frequency, cause and duration of lockdowns;

(2) The presence of persons with serious mental illness or developmental and intellectual disabilities in isolated confinement or on restrictive housing status;

(3) Efforts to increase the time an incarcerated person spends outside of such person's cell;

(4) The provision of therapeutic and other pro-social programming for persons on restrictive housing status;

(5) The use of in-cell restraints; and

(6) Fostering cooperation and engagement with the Correction Ombuds pursuant to section 2 of this act and the Correction Advisory Committee established pursuant to section 18-81jj, as amended by this act.

[(c)] (i) The [Department of Correction] department shall [at least] annually on or before January first submit to the Criminal Justice Policy and Planning Division established under section 4-68m a report containing, [as aggregated] in a disaggregated and anonymized format, the following data, which shall be broken down by facility and the age, race and sex of incarcerated persons included in the data:

(1) The number of [inmates on restrictive housing status] incarcerated persons in isolated confinement in this state's correctional facilities, as of the first day of each of the twelve months preceding the date of the submission of the report [. The department shall report and disaggregate such data based on an inmate's age, gender identity, ethnicity, mental health score as calculated by the department, if any, and the form and phase of housing in which such inmate is held on restrictive housing status] and the total number of persons subjected to isolated confinement during the twelve months preceding the date of

*Substitute Senate Bill No. 459*

submission of the report;

(2) The number of [inmates on administrative segregation status who have spent the following cumulative durations of time on administrative segregation status] incarcerated persons who were in isolated confinement for more than fifteen cumulative days in the previous calendar year as categorized by the following periods of time:

[(A) One to fifteen days;]

[(B)] (A) Sixteen to thirty days;

[(C)] (B) Thirty-one to [one hundred eighty] sixty days;

[(D) One hundred eighty-one to three hundred sixty-five days;

(E) Three hundred sixty-six to seven hundred thirty days;

(F) Seven hundred thirty-one to one thousand ninety-five days;

(G) One thousand ninety-six to one thousand four hundred sixty days;

(H) One thousand four hundred sixty-one to one thousand eight hundred twenty-five days;

(I) One thousand eight hundred twenty-six to two thousand one hundred ninety days;

(J) Two thousand one hundred ninety-one to two thousand five hundred fifty-five days;

(K) Two thousand five hundred fifty-six to two thousand nine hundred twenty days;

(L) Two thousand nine hundred twenty-one to three thousand two hundred eighty-five days;

*Substitute Senate Bill No. 459*

(M) Three thousand two hundred eighty-six to three thousand six hundred fifty days; and**]**

(C) Sixty-one to ninety days; and

**[**(N)**]** (D) More than **[**three thousand six hundred fifty**]** ninety days;

(3) **[**For each correctional facility, the**]** The number of **[**inmates who, during the twelve months preceding the date of the submission of the report, spent more than fifteen days, cumulative, on administrative segregation status. The department shall report and disaggregate such data based on an inmate's age, gender identity, ethnicity, mental health score as calculated by the department, if any, and the form and phase of restricted housing in which such inmate is held; and**]** incidents broken down by month during the previous calendar year in the department's facilities categorized as:

(A) Suicides by incarcerated persons;

(B) Attempted suicides by incarcerated persons;

(C) Self-harm by incarcerated persons;

(D) Assaults by incarcerated persons on staff members; and

(E) Assaults and fights between incarcerated persons;

(4) **[**Actions taken by the department during the twelve months preceding the date of the submission of the report to minimize reliance on administrative segregation status and to mitigate the harmful effects of administrative segregation status on inmates, staff and the public.**]** Monthly reports showing the total number of incarcerated persons against whom the department has used force, including use of the following:

(A) Chemical agent devices;

*Substitute Senate Bill No. 459*

(B) Full stationary restraints;

(C) Deadly physical force;

(D) In-cell restraints;

(E) Less than lethal munitions;

(F) Lethal munitions;

(G) Medical restraints;

(H) Physical force;

(I) Therapeutic restraints;

(J) Cell extraction; and

(K) Canines;

(5) Grievances filed by incarcerated persons, broken down by month, including the number of grievances filed, dismissed, affirmed or otherwise resolved;

(6) Programs offered to incarcerated persons, including the program title and a brief description of the program, the number of spots available in each program and the number of persons enrolled in each program as of the first of each month;

(7) Internal department work assignments held by incarcerated persons, including the work assignment title, the daily wage paid and the number of such persons in each position as of the first of each month; and

(8) External jobs held by incarcerated persons working for outside employers, including the job title, hourly wage paid, the number of such persons in each position as of the first of each month and the name of

*Substitute Senate Bill No. 459*

each employer.

[(d) The department shall not hold any person under eighteen years of age on administrative segregation status.

(e) Not later than January 1, 2019, the Commissioner of Correction shall study and submit a report, in accordance with the provisions of section 11-4a, to the joint standing committee of the General Assembly having cognizance of matters relating to the judiciary regarding the use and oversight of all forms and phases of housing for inmates on restrictive housing status.]

[(f)] (j) The provisions of [subsections (a) to (d), inclusive, of] this section do not apply to any [inmate] incarcerated person described in subsection (a) of section 18-10b.

[(g) Within available appropriations, the Department of Correction shall provide training to employees of the department who interact with inmates concerning the following:

(1) The recognition of symptoms of mental illness;

(2) The potential risks and side effects of psychiatric medications;

(3) De-escalation techniques for safely managing individuals with mental illness;

(4) Consequences of untreated mental illness;

(5) The long and short-term psychological effects of being on administrative segregation status; and

(6) De-escalation and communication techniques to divert inmates from situations that may lead to the inmate being placed on administrative segregation status.

**Public Act No. 22-18**                                        **20** *of 23*

*Substitute Senate Bill No. 459*

(h) Within available appropriations, the Department of Correction shall take measures to promote the wellness of employees of the department who interact with inmates. These measures may include, but need not be limited to:

(1) Employee assistance programs;

(2) Peer support programs; and

(3) Stress management training.]

(k) The department shall publish on its Internet web site the formula for calculating an incarcerated person's mental health score and any report pursuant to subsection (i) of this section.

Sec. 4. Section 1-300 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2022*):

(a) There is established the Office of Governmental Accountability. The executive administrator of the office shall serve as the administrative head of the office, who shall be appointed in accordance with the provisions of section 1-301, as amended by this act.

(b) The Office of Governmental Accountability shall provide personnel, payroll, affirmative action and administrative and business office functions and information technology associated with such functions for the following: The Judicial Review Council established under section 51-51k, Judicial Selection Commission established under section 51-44a, Board of Firearms Permit Examiners established under section 29-32b, Office of the Child Advocate established under section 46a-13k, Office of the Victim Advocate established under section 46a-13b, [and] State Contracting Standards Board established under section 4e-2 and Office of the Correction Ombuds, established under section 2 of this act. The personnel, payroll, affirmative action and administrative and business office functions of said offices, commission, council and

**Public Act No. 22-18**                                    *21 of 23*

*Substitute Senate Bill No. 459*

boards shall be merged and consolidated within the Office of Governmental Accountability.

(c) The executive administrator may employ necessary staff to carry out the administrative functions of the Office of Governmental Accountability, within available appropriations. Such necessary staff of the Office of Governmental Accountability shall be in classified service.

(d) Nothing in this section shall be construed to affect or limit the independent decision-making authority of the Judicial Review Council, Judicial Selection Commission, Board of Firearms Permit Examiners, Office of the Child Advocate, Office of the Victim Advocate, [or the] State Contracting Standards Board or Office of the Correction Ombuds. Such decision-making authority includes, but is not limited to, decisions concerning budgetary issues and concerning the employment of necessary staff to carry out the statutory duties of each such office, commission, council or board.

Sec. 5. Subsection (a) of section 1-301 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) (1) There shall be a Governmental Accountability Commission, within the Office of Governmental Accountability established under section 1-300, as amended by this act, that shall consist of [six] seven members as follows: (A) The executive director of the Judicial Review Council established under section 51-51k, or the executive director's designee; (B) the chairperson of the Judicial Selection Commission established under section 51-44a, or the chairperson's designee; (C) the chairperson of the Board of Firearms Permit Examiners established under section 29-32b, or the chairperson's designee; (D) the Child Advocate appointed under section 46a-13k, or the advocate's designee; (E) the Victim Advocate appointed under section 46a-13b, or the advocate's designee; [and] (F) the chairperson of the State Contracting

*Substitute Senate Bill No. 459*

Standards Board established under section 4e-2, or the chairperson's designee; and (G) the Correction Ombuds appointed under section 18-81jj, as amended by this act, or the Correction Ombuds' designee, provided no person serving as a designee under this subsection may be a state employee. The Governmental Accountability Commission shall select a chairperson who shall preside at meetings of the commission. Said commission shall meet for the purpose of making recommendations to the Governor for candidates for the executive administrator of the Office of Governmental Accountability pursuant to the provisions of subsection (b) of this section, or for the purpose of terminating the employment of the executive administrator.

(2) The commission established under subdivision (1) of this subsection shall not be construed to be a board or commission within the meaning of section 4-9a.

Attachment F

is **DENIED** as moot because the plaintiff is now confined in Oregon.

The plaintiff's motion for summary judgment **[Doc. #60]** is **DENIED** as moot in light of the dismissal of this action.

The Clerk is directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED** at Hartford, Connecticut this _15 TH_ day of February 2013.

_____
Alfred V. Covello
United States District Judge

prejudiced one of his existing actions, or otherwise actually interfered with his access to the courts.  See <u>Monsky v. Moraghan</u>, 127 F.3d 243, 247 (2d Cir. 2002).  For example, the plaintiff could demonstrate an actual injury by providing evidence "that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of the deficiencies in the prison's legal assistance facilities, he could not have known."  <u>Lewis</u>, 581 U.S. at 351.

Clearly, the plaintiff was able to file this case and has filed motions and other documents complete with exhibits.  The court concludes that the plaintiff fails to allege any facts demonstrating an actual injury to support his claim of denial of access to the courts.  See <u>Thomas v. Egan</u>, 1 Fed. App'x 52, 54 (2d Cir. 2001) (confiscation of legal documents insufficient to demonstrate violation of right of access to the courts absent showing of actual injury).  The claim for denial of access to the courts is dismissed pursuant to 28 U.S.C. § 1915A.

## Conclusion

The defendants' motion to dismiss [**Doc. #73**] is **GRANTED**.  The remaining claims in the amended complaint that were not addressed in the motion to dismiss, denial of property, denial of access to the courts, denial of equal protection and denial of right to correspond, are **DISMISSED** pursuant to 28 U.S.C. § 1915A.

The plaintiff's motion for preliminary injunction [**Doc. #61**]

UNITED STATES DISTRICT COURT
DISTRICT OF COONECTICUT

John C. Barletta                                    Prisoner:
   -V-                                        Civil No: 3:10 –CV- 939 (AVC)
Angel Quiros                                        November 27th 1012

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS OPPOSITION FOR PRELIMINARY INJUNCTIVE RELIEF

The defendant is asking the court to deny the plaintiff's motion for preliminary injunction as moot, claiming that because the plaintiff was involuntary transfer out of state by the defendants to the state of Oregon. The defendants make the further claim that the court can not offer the plaintiff any practical relief being he is now in the state of Oregon.
The plaintiff started this civil action on June 6th 2010, two and a half years ago, because the defendants have been violating his civil, & constituently rights since June 22nd 2009. The plaintiff is seeking relief from the court. Just because he was transfer dose not mean that the defendants "SHOULD NOT BE HELD ACCOUNTABLE FOR THEIR ACTIONS."

### AS TO POINT ONE (1) MOOTNESS

A case is moot when the legal dispute between the plaintiff and the defendant has been resolved for practical purposes, or has ceased to exist, i.e., when there is no longer a "live" case or controversy.  Mootness is established Only If:
1) It can be said with assurance that there is NO reasonable expectation that the alleged violation will reoccur, and 2) Interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.  Community Schools –V- Seattle Sch. Dist. No. 1. 551, US. 701, 719, 127, C.CT. 2738 (2007) ; Holland –V- New Jersey Dept Of Corr. 246, F.3d 267, 274 (3rd Cir. 2001) : A case is not moot even if the [appellants] primary injury is resolved so long as the [appellant] continues to suffer some harm that a favorable court decision would remedy.
If there is a concrete reason to believe that the violation is likely to reoccur, THE CASE IS NOT MOOT; see: Washington –V- Harper 494, US. 210, 218-19, 110, S.CT. 1028 (1990).

This violation will reoccur when the plaintiff transfers back to Connecticut, as it has in the past. The plaintiff is still suffering from injury of the defendant's actions that a favorable or partial ruling would remedy. The plaintiff is still a CT. prisoner where the state of Connecticut still retains legal custody over the plaintiff, as per inter-state compact transfer. The plaintiff is still in accordance with all sentence structure and all applicable administrative directives just as he was still incarcerated in Connecticut.

On October 4th 2000 the plaintiff had a similar case pending when he was transferred out of state to Virginia. The case was dismissed (in state court) as moot, and the plaintiff did not challenge it because he was receiving all his material in Virginia with no problem. The plaintiff then was transferred to Maryland on September 6th 201 where he possessed all his literature and material with no problems.

On the plaintiff's return to CT. on June 22nd 2009 the defendants confiscated his religious material again giving rise to a reoccurring case battling the same issue again. Eventually the plaintiff will be returned to Connecticut and this / these issues will reoccur, therefore they can not be moot.

The party claiming mootness has the burden of showing that the case is actually moot, see: Friends Of The Earth Inc. –V- Laidlaw Environmental Services (toc) Inc. 528, US. 167, 189, 120, S.CT. 693 (2000): Firefighters Local 1784 –V- Stotts 467, US. 561, 569-70, 104, S.CT. 2576(1984) Like standing mootness is an issue for claims for injunctive or declaratory relief: 'ONCE YOU ARE INJURED YOUR CLAIM FOR RELIFE OR DAMAGES DOSE NOT BECOME MOOT:"see: County Of Riverside –V- McLaughlin 500, US. 44, 51, 11, S.CT. 1661 (1991)

### DEFENSE CLAIM NO.2, IS BECOUSE PLAINTIFF WAS TRANSFORD OUT OF STATE, THAT THE COURT CAN NOT OFFER RELIFE THEREFORE SHOULD BE MOOT

This has been a long pending case active for two and a half years in Connecticut before the plaintiff was transferred, transfer dose not moot an issue, in Boag –V- MacDougall 454, US. 364, 102, S.CT. 700 (1982) quoting: " transfer to another prison did not moot prisoners damages claim arising from placement in earlier prison, short lived legal violations that are over with before they can be challenged in court are not considered moot "if they are capable of repetition" yet evading[judicial] review." "If there is a reasonable likelihood that they will happen again to the same plaintiff. See: Spencer –V- Kemna 523 US. 1, 17-18, 118, S.CT. 978(1998) accord. Honig –V- Doe 484, US. 305, 318, 108, S.CT. 592(1988): also see: Bowens –V– Quinn 561 F.3d 671, 673, (7th Cir. 2009): Lynch –V-Baxley 744, F.2d 1452, 1457 (11th Cir. 1984)

transfer or release will also not moot a case if the action that the plaintiff has challenged has continuing effect after the transfer or release Vitek –V- Jones 445, US. 480, 486-87, 100, S.CT. 1254 (1980);   Mujahid –V- Daniels 413, F.3d 991, 994-995, (9th Cir. 2005):  Thompson –V- Carter 284 F.3d 411, 415, (2nd Cir. 2002):  Washington –V- James 782, F.2d 1134, 1137, (2nd Cir.1986):  Chapman –V-Pickett 586, F.2d 22, 26,-27, (7th Cir. 1978);

In 2000 in a similar case and issues the defendants took photographs of the plaintiff's because of a "world church of the creator flag in the background", and because the plaintiff's friends were wearing t-shirts, jeans, boots, and suspenders. The defendant's objected to the way they were dressed , After Judge Rittenband viewed these photographs, he told the defendants that they can not censor that or take my photographs, Judge Rittenband gave the plaintiff his photos back, the defendants took these photos again in 2009 " showing a reoccurring pattern for the same issue and the same plaintiff".
Prison officials can not merely brandish the words "safety and security" and expect that their actions will automatically be deemed constitutionally permissible by the court, see: Marria –V- Broaddus 2003 US. Dist. Lexis 13329 (2nd Cir.)

District of Connecticut

John C. Barletta                          Prisoner

    ·v·                              Civil No: 3:10-cv-939 (AVC)

Angel Quiros et, al               October 13th, 2018  COURT
                                                      HARTFORD CT

FILED

## PLAINTIFF'S MOTION ON JUST
## TERMS TO RE-OPEN FEDERAL CASE

Pursuant to Fed R Civ P. 60 (b)(6) "on Motion
and Just Terms", The Court may relieve a party or
its legal representative from a Final Judgement order
or Proceeding for the following reasons:

1) Mistake, inadvertence, Suprise, or excusable neglect;

2) Newly discovered evidence that with reasonable diligence
   could not have been discovered in time to move for a
   new Trial under Rule 59 (b);

3) Fraud (whether previously called intrinsic or extrinsic)
   misrepresentation, or misconduct by the opposing party;

4) The Judgement is void,

5) The Judgement has been Satisfied, released, or discharged,
   it is based on an earlier Judgement that has been
   reversed or vacated, or applying it prospectively is no
   longer equitable; or

6) Any other reason that Justifies relief.

Pursuant to Rule 60 (b)(6) grants the Federal Court
broad authority To relieve a party from a Final Judgement

P 1

find Case 3:10-cv-00981-AWT   Document 60-1   Filed 04/23/12   Page 17 of 17 tional
Anderson. v. Creighton 483 U.S. 635, 640, 101, S. Ct. 3034 (1987) the
defendants are Not Entitled to Qualified Immunity.

4)              CONCLUSION

A Reasonable Jury Could Find for the plaintiff based on The facts in
the plaintiff's affidavit with exibits attached to This brief. The court
Should Grant Summary Judgment on Liability to the plaintiff's claim
hearwith in. The amount of damages due to the plaintiff must be
determined at Trial. Patterson. v. Coughlin 905 F.2d 564, 570,
(2nd cir. 1990)

                        respectfully Submitted

                        John c. Barletta
                        Northern Corr. Enst
                        Po box 665   Somers ct.
                                         06071

              Certification

I hearby Certify That a copy of The foregoing was mailed by us. postal
Service to Attorney General's office A.A.G. Steven R. Strom at
110 Sherman St. Hartford, ct. 06105   on   April 18 2012

                        John c. Barletta

"upon such terms are just" provided that the motion is made within reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5). Buck v Davis 137 S CT 759, 777-28 (2017).
See: Liljeberg -v- Health Serv. Acquisition Corp., 486 U.S. 847, 863 (1988)

Rule 60 (b) vest wide discretion in courts, but have held that relief under rule 60 (b)(6) is only available in "extraordinary circumstances".
Gonzalez -v- Crosby 545 U.S. 524, 527 (2005)
In determining whether extraordinary circumstances are present a court may consider a wide range of factors such a "the risk of injustice to the parties", and "the risk of undermining the publics confidence in the judicial process,
Liljeberg 486 U.S. at 863-64

In this above titled case the plaintiffs case was dismissed as "Moot" in on or about Dec. 2012 / Feb. 2013 because of an "Involuntary prison transfer out of state."

Originally the plaintiff argued that the case can not be moot being it could not be said with assurance that their is no reasonable expectation that said violations will not reoccur with the same defendants and plaintiff

Case 3:22-cv-01110-SALM    Document 28    Filed 01/03/23    Page 53 of 65
Case 3:22-cv-01110-SALM    Document 26-8    Filed 12/27/22    Page 3 of 10

Case 3:10-cv-00939-AVC    Document 92    Filed 11/05/18    Page 3 of 4

The plaintiff raised The points This was in fact The 3ʳᵈ time
These same issues were brought before The court by The same
plaintiff against The same defendant

And that on his return to Connecticut these same issues would
arise again without a ~~Favorable~~ Favorable ruling

Further The plaintiff argued his case in court for over 2½
years & recently filed for Summery Judgement against The
defendant. That was never ruled on by The court because of the
defendants tactic of sending the plaintiff out of State
every time he files a civil suit. Then asked The Court to
dismiss The case as moot

Attached is original argument on why The defendants
case should Not have been considered Moot.

The plaintiff John C Barletta is Now back in Ct.
and is being subjected to the same racist, discrimanatory
harassing treatment by the same defendants on religious
discriminatory grounds.

The defendant Jon Aldi stated No Religious literature from
The church of the creator would be allowed in Conn.
D.o.c. And are Not allowing me to have any Social
Contact with known members of the church
and confiscated my religious literature

Bringing rise to the exact same issues again

3

with The Same Plaintiff and defendants for the Third time
Giving The plaintiff no other option then to ask The
Court To revisit this Case and Finally let the
plaintiff have his day in Court.

For This reason The plaintiff requests that this Case be
re-opend prr Fed. R.c.v. p 60 (b)(6)

Respectfully submitted
b/ pro-se prisoner
John C. Barletta

John C. Barletta
Po. box 665
Somers, Ct. 06071

Certification

I hear by Certify that a copy of the Forgoing motion
was mailed to the attorney generals office to Steven R.
Storm at 110 Sherman st Hartford, CT b/ us postal senice
on Nov. 3rd 2018
John C. Barletta
John C. Barletta

4

UNITED STATES DISTRICT COURT
DISTRICT OF COONECTICUT

John C. Barletta                                  Prisoner:
    -V-                                           Civil No: 3:10 –CV- 939 (AVC)
Angel Quiros                                      November 27th 1012

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS OPPOSITION FOR PRELIMINARY INJUNCTIVE RELIEF

The defendant is asking the court to deny the plaintiff's motion for preliminary injunction as moot, claiming that because the plaintiff was involuntary transfer out of state by the defendants to the state of Oregon. The defendants make the further claim that the court can not offer the plaintiff any practical relief being he is now in the state of Oregon.
The plaintiff started this civil action on June 6th 2010, two and a half years ago, because the defendants have been violating his civil, & constituently rights since June 22nd 2009. The plaintiff is seeking relief from the court. Just because he was transfer dose not mean that the defendants "SHOULD NOT BE HELD ACCOUNTABLE FOR THEIR ACTIONS."

## AS TO POINT ONE (1) MOOTNESS

A case is moot when the legal dispute between the plaintiff and the defendant has been resolved for practical purposes, or has ceased to exist, i.e., when there is no longer a "live" case or controversy.  Mootness is established Only If:
1) It can be said with assurance that there is NO reasonable expectation that the alleged violation will reoccur, and 2) Interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.  Community Schools –V- Seattle Sch. Dist. No. 1. 551, US. 701, 719, 127, C.CT. 2738 (2007) ; Holland –V- New Jersey Dept Of Corr. 246, F.3d 267, 274 (3rd Cir. 2001) : A case is not moot even if the [appellants] primary injury is resolved so long as the [appellant] continues to suffer some harm that a favorable court decision would remedy.
If there is a concrete reason to believe that the violation is likely to reoccur, THE CASE IS NOT MOOT; see: Washington –V- Harper 494, US. 210, 218-19, 110, S.CT. 1028 (1990).

This violation will reoccur when the plaintiff transfers back to Connecticut, as it has in the past. The plaintiff is still suffering from injury of the defendant's actions that a favorable or partial ruling would remedy. The plaintiff is still a CT. prisoner where the state of Connecticut still retains legal custody over the plaintiff, as per inter-state compact transfer. The plaintiff is still in accordance with all sentence structure and all applicable administrative directives just as he was still incarcerated in Connecticut.

On October 4th 2000 the plaintiff had a similar case pending when he was transferred out of state to Virginia. The case was dismissed (in state court) as moot, and the plaintiff did not challenge it because he was receiving all his material in Virginia with no problem. The plaintiff then was transferred to Maryland on September 6th 201 where he possessed all his literature and material with no problems.

1

Attachment G.



# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
### *OFFENDER CLASSIFICATION & POPULATION MANAGEMENT*
### 1153 EAST STREET SOUTH
### SUFFIELD, CONNECTICUT 06080

September 7, 2021

Barletta, John #219324
MacDougall Walker Correctional Institution
1153 East Street South
Suffield, CT 06080

Mr. Barletta:

This will acknowledge receipt of your correspondence received by the Governor's office on August 25, 2021 concerning your request to have your special needs status reviewed. Your correspondence was forwarded to my office for review and response.

I have reviewed the documents associated with your placement on special needs dated April 13, 2017 to include the individualized facility management plan. In accordance with Administrative Directive 9.4 Restrictive Status section 13E, the individualized facility management plan "shall include recommendations to assist the inmate in achieving removal from special needs management status." If the Unit Administrator in consultation with the Director of Psychological Services feels that you have completed the programmatic recommendations of your plan, they may recommend removal from Special Needs status. Upon receipt of such recommendation, I will determine appropriateness of the removal in consultation with the Deputy Commissioner of Operations and Rehabilitative Services.

As always, I encourage continued positive institutional adjustment which will aid in your reintegration to general population.

Sincerely,

*D. Maiga*

Director of Offender Classification and Population Management

C:

       Governor Lamont
       Commissioner Quiros
       Deputy Commissioner Mulligan
       Director of Programs and Treatment Garcia
       Warden Barone
       OCPM File

Attachment H



# STATE OF CONNECTICUT
## *DEPARTMENT OF CORRECTION*
### NORTH DISTRICT
### Northern Correctional Institution
### P.O. Box 665
### Somers, Connecticut 06071

860-763-8615
**Angel Quiros**
**Warden**

TO:         JOHN BARLETTA #219324
            1 WEST 225

FROM:       Warden Quiros

DATE:       February 8, 2011

RE:         **High Security Appeal**

*Your placement on high security in <u>July of 2009</u> upon your return to Connecticut was based on policies in A.D. 9.4. Specifically, your documented history of serious disruptive behavior including your assaults on staff and other inmates which poses a threat to safety/security is the basis for your placement.*

*Your appeal is denied.  You will be reviewed in six months.*

cc: *D/W Powers*
    *File*

*An Equal Opportunity Employer*

Exhibit B

# Inmate Request Form
## Connecticut Department of Correction

| | |
|---|---|
| Inmate name: John C. Barletta | Inmate number: 219324 |

| | | |
|---|---|---|
| Facility/Unit: N.C.I | Housing unit: L West - 223 | Date: 5-22-10 |

Submitted to: Warden Junios

Request: Approximatly 3½ months ago during one of your tours You verbally told me at the cell door "That special needs Prisoners will be allowed the same property as level 4 general population and death row prisoners".

On 5-21-10 I was told by the property officer and Capt Saylors That I could Not have my music cd's, That Their Not allowed

Other special Needs Prisoners have Their music cd's and death row prisoners still have their music cd's.

Why Am I being denied what is given to other prisoners on the same status? Cassette tapes are treated as an obsolete Technology and are No longer sold by music by mail or other music Co.

**continue on back if necessary**

Previous action taken:

**RECEIVED**

**MAY 25 2010**

**N.C.I WARDEN'S OFFICE**

**continue on back if necessary**

| Acted on by (print name): Junios | Title: Warden |
|---|---|

Action taken and/or response: Be advised that a copy of this T/m request will be forwarded to the CPT Little to address.

CC: CPT Little

**continue on back if necessary**

| Staff signature: Junios | Date: 5/25/10 |
|---|---|



# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
### *OFFENDER CLASSIFICATION & POPULATION MANAGEMENT*
**1153 EAST STREET SOUTH
SUFFIELD, CONNECTICUT 06080**

January 11, 2010

John Barletta #219324
Northern CI
287 Bilton Rd
Somers, CT 06071

Dear Mr. Barletta,

This will acknowledge receipt of your letter regarding your progression in the Administrative Segregation (A/S) program. Even though the Director of Offender Classification & Population Management determines an offender's placement on A/S, he/she does not manage the programming aspect of A/S. An offender's progression through the program is determined by facility staff. Since you have concerns with the inconsistencies of your progression compared with others I will, via copy, apprise Warden Quiros.

Sincerely,

Stephen Clapp
Counselor Supervisor
Offender Classification & Population Management

C:    Warden Quiros- Northern CI
      Master File
      AS  file

**CONFIDENTIAL** ~~rievance~~me: John C. Barletta

(FOR OFFICIAL USE ONLY)    ~~necticut D~~    Inmate number: 219324    Housing: 1-west-210

| SECTION 4 | STATE THE PROBLEM AND REQUESTED RESOLUTION |
|---|---|

Provide any factual information that is applicable, including any responses from staff. State the action that you think should be taken to resolve the problem. PLEASE PRINT. On or about Oct 20-22, 2009. I was approved to advance to phase II I signed my Phase advancement paper on (or about) oct. 20-22. Sence then every one else who signed their Paper for phase advancement was moved up the hall into the phase II program. When I asked about my goin To the program I was initially told by cto Mumun, and capt little that their was no room for me being Im classified by M.H.U., Security, and administration as Single cell Status.  I foolishly belived this.

Then on or about Nov 22-23 thay moved a Second group of 16 prisoners to Phase II, So the following day I questioned Capt little, asking, "If their is No room for me 1 man, how can their be room for 16 men" I was Then told by capt. little, "That the warden did not want to move me, that he had a Special program for me I was also told, that I was getting Creit for being in The phase program Sence oct 22.

Today is Dec. 17 and a third group is being moved up the hall for Phase II. Im still waiting.

Ive written numerous requests to Counselor trango, about my phase advancement, Phase status / A/s status he keeps responding "No one will tell him nothing.

I was Told That S.R.G. T.M. ONLY had to do 30 days in phase II then thay were removed from A/s status and Placed in the gang block, I was told I have to go to the SR.G. tm. gang block. So am I off A/s status? If I'm getting Creit for my Phase advancement time Sence oct. 22. 09, I should have been in The gang block a month ago.

Ive been told That Im Technically on phase II although Im housed in phase I, I'm being denied my Phase II Privdglege Also Policy States after 30 days Phase II I should be moved to the SRG tm block, I am being denied the Privdgleges afforded to me in that block also. SRG tm are allowed Electric beard trimmers, This is a privdlege I nee to take advantage of, being Im on No razor Status for an incident that happend 10 years ago.

Im being discriminated against for some unknown reason, Im being Singled out and denied program advancemen That I'm eligible for. I want some written guarantee that Im getting Creit for my time Sence oct. 22. 09 when I signed my advancement papers, I should be off adm Segergution Per Policy

| Inmate signature: Jon C. Barletta | Date: 12-17-09 |
|---|---|

For all remedies except health services, deposit this form in the **Administrative Remedies box**.
For a health services issue, deposit this form in the **Health Services box**.

| SECTION 5 | DECISION / OFFICIAL USE ONLY – DO NOT WRITE IN THE SPACE BELOW |
|---|---|

| Date Received: 12-18-09 | IGP #: 141-10-247 | T#: |
|---|---|---|

| Disposition: Compromised | Date of Disposition: 12-30-09 |
|---|---|

Reason:
Your grievance regarding unit policy is compromised. Your progression process is still under review and will be completed in a timely manner.

☐ You have exhausted DOC's Administrative Remedies.    ☑ This matter may be appealed to: DA Lajoie

| Signature: Warden Y Guns | Date: 12/18/09 |
|---|---|

**Inmate Request Form**
**Connecticut Department of Correction**

REV

| | |
|---|---|
| Inmate name: CONT. From Level 2 Grievance | Inmate number: |
| Facility/Unit: | Housing unit: | Date: |

Submitted to: P. 2 of Level 2 Grievance

Request: Most of my group I was to Progress with were taken off A/s status after 30 days in Phase II and moved to The SRG-ST.M. block to start the gang Program, where I should have been placed over 2 months ago

I'm being denied program progression that is given to every other inmat (except me) This is harrassment and discrimination.

I am entitled to programs, Property, and privdleges afforded with Phase advancement

Please returne a copy of All 4 pages with your responce Thank You

**continue on back if necessary**

Previous action taken:

**continue on back if necessary**

Acted on by (print name): | Title:

Action taken and/or response:

**continue on back if necessary**

Staff signature: | Date:



**Inmate G.**     **Appeal Form - Levels 2/3**     CN 9604
**Con.**     **Department of Correction**     REV 1/31/09

| Inmate name: John C. Barletta | Inmate number: 219324 |
|---|---|

| Facility/Unit: Northern C.I | Housing unit: 1-west 210 | Date: 12-31-09 |
|---|---|---|

| IGP number: 141-10-247 | T number: |
|---|---|

Use this form to appeal a Level 1 decision. CN 9602, Inmate Administrative Remedy Form and any attachments must accompany this form; no review will be undertaken if they do not accompany this form. Your appeal must be filed within 5 days of the Level 1 response; deposit it in the "Administrative Remedies" box.

**Appeal of Level 1 Decision to Level 2**

I am appealing the Level 1 decision because: The Warden Stated my Progression will be Compleated in a timely manner, This is False, I've already waited 3 months Sence I was approved. this is Not a timely Manner. Per policy of the Adm. Dir. Inmate, Complaints / requests a timely Manner is to Allow 15 Business days to Respond   Not 3+ months.   In 12 days The 4th Group will go up to the program, where my original group will be in Phase III

| Inmate signature: John C. Barletta | Date: 12-31-09 |
|---|---|

**FOR OFFICIAL USE ONLY - LEVEL 2 REVIEW**

| Date received: 1/11/10 | Disposition: Compromised | Date of disposition: 2/17/10 |
|---|---|---|

Reasons:
*You are appealing a level 1-grievance concerning unit policy. On 2/10/10 your level was lowered from a level 5 to a level 4. You have been released from A/S status and your level 2 grievance remains compromised.*

Level 2 reviewer:

☐   This grievance may be appealed within 5 days to Level 3.

☒   You have exhausted the Department's Administrative Remedies. Appeal to Level 3 will not be answered.

**Appeal of Level 2 Decision to Level 3**

I am appealing the Level 2 decision because:

| Inmate signature: | Date: |
|---|---|

**Deposit your appeal in the "Administrative Remedies" box.**

**FOR OFFICIAL USE ONLY - LEVEL 3 REVIEW**

| Date received: | Disposition: | Date of disposition: |
|---|---|---|

Reasons:

Level 3 reviewer:



# Inmate Security Risk Group Safety Threat Member Six-Month Review
### Connecticut Department of Correction

CN 61405
1/15/09

## DIRECTOR OF SECURITY REVIEW

| Inmate Name: | Barletta, John | Inmate Number: | 00219324 |
|---|---|---|---|

**Conclusions/recommendations:**

Inmate Barletta is currently in Phase One of the Administrative Segregation Phase Program.  He has received 1 disciplinary report(s) within the past six months.  He was designated as a SRGTM on July 20, 2009 and transferred to Northern CI on June 22, 2009 from Cuscom to MD.

I concur with the facility's recommendation that inmate Barletta's SRGTM status remains pending his successful completion of the Close Custody Phase Program at Northern CI.

| Security Division Director signature: | _signature_ | Date: | 7-1-10 |
|---|---|---|---|

## COMMISSIONER REVIEW

☑ **Continue as a Security Risk Group Safety Threat Member.**

☐ **Discontinue as a Security Risk Group Safety Threat Member.**

**Comments:**

| Commissioner signature: | _signature_ | Date: | 7-1-10 |
|---|---|---|---|

cc:
Director of Security (original and all attachments)
Deputy Commissioner of Operations (form only)
Unit Administrator (form only)
Director of Offender Classification and Population Management (form only)
inmate (form only)
inmate master file (form only)
inmate security risk group file (form only)

Exhibit A